**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| JOSEPH E. RUCCO, on behalf of himself and all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>SOLVENTUM CORPORATION,<br><br>*Defendant*. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## <u>CONSOLIDATED CLASS ACTION COMPLAINT</u>

Plaintiff Joseph Rucco brings this Consolidated Class Action Complaint on behalf of himself, and all others similarly situated, against Defendant Solventum Corporation ("Solventum" or "Defendant"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to him, which are based on personal knowledge:

**NATURE OF THE CASE**

1. Plaintiff brings this class action lawsuit on behalf of all persons whose sensitive Personally Identifiable Information ("PII")[1] and Protected Health Information ("PHI") (together with PII, "Private Information") was entrusted to Solventum and was impacted in a data breach that Defendant disclosed to Plaintiff and Class Members on or around March 29, 2026.

2. Defendant is a healthcare corporation based in Eagan, Minnesota, that was formed after completing a spin-off from the 3M Corporation on April 1, 2024.

3. Defendant is a service provider to clients including New York City Health & Hospitals Corporation.

4. In the course of rendering services to its clients, Defendant solicited, obtained, and stored Private Information belonging to New York City Health + Hospitals patients and other individuals.

5. Defendant had numerous statutory, regulatory, contractual, and common law duties and obligations to keep Plaintiff's and Class Members' Private Information confidential, safe, secure, and protected from unauthorized disclosure or access.

6. On June 11, 2026, Plaintiff received a "Notice of HIPPA Privacy Breach," informing him that a Threat Actor had gained unauthorized access to his Protected Health

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79.

Information (PHI) as well as the PHI of other New York City Health + Hospital patients, as a result of a data security incident at Solventum.

7. According to that letter, this unauthorized access (the "Data Breach" or "Breach") occurred on or around March 29, 2026, and was discovered by Solventum on or around March 30, 2026.

8. Despite apparently learning of the Breach on March 30, 2026, Solventum did not notify NYC Health + Hospital until April 21, 2026, two days *after* the PHI involved in the Breach was posted on the Dark Web.[2]

9. The PHI involved in the Breach included, at a minimum, patients' first and last name, address, date of birth, medical record numbers, medical history, and diagnoses.

10. Plaintiff's claims arise from Defendant's failure to properly secure and safeguard the Private Information that it was entrusted with.

11. Defendant owed Plaintiff and Class Members a duty to take all reasonable and necessary measures to keep the Private Information collected safe and secure from unauthorized access. Defendant solicited, collected, used, and derived a benefit from this Private Information, yet breached its duty by failing to implement or maintain adequate security practices.

12. The sensitive nature of the data exposed through the Data Breach signifies that Plaintiff and Class Members have suffered irreparable harm. Plaintiff and Class

---

[2] *Notification of Unauthorized Access to PHI*, NEW YORK CITY HEALTH + HOSPITALS, June 11, 2026, available at https://www.nychealthandhospitals.org/pressrelease/notification-of-unauthorized-access-to-phi/ (last accessed June 16, 2026).

Members have lost the ability to control their Private Information and are subject to an increased risk of identity theft.

13. Notably, Defendant has not disclosed the nature of the attack, nor why the Breach went unannounced for months.

14. The Breach occurred in part because of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information, Private Information with which Defendant was entrusted during the course of its engagement with New York City Health + Hospitals.

15. As a direct and proximate result of Defendant's failure to implement and follow basic security procedures, Plaintiff's and Class Members' Private Information is now in the hands of cybercriminals.

16. Defendant disregarded the rights of Plaintiff and Class Members by, *inter alia*, intentionally, willfully, recklessly, and/or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members with prompt and timely notice of the Data Breach.

17. Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, intrusion of their health privacy, and similar forms of criminal mischief. These risks may last for the rest of their lives.

Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

18. Plaintiff and Class Members have suffered numerous actual and concrete injuries as a direct result of the Data Breach, including: (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (e) deprivation of value of their Private Information; (f) invasion of their privacy and (g) the continued risk to their sensitive Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information it collected and maintained.

19. Plaintiff seeks monetary damages and injunctive relief, including the adoption of reasonably sufficient practices to safeguard the Private Information in Defendant's custody to prevent incidents like the Data Breach from reoccurring in the future, and for Defendant to provide identity theft protective services to Plaintiff and Class Members for their lifetimes.

20. More specifically, Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendant, and declaratory relief.

**PARTIES**

21. Plaintiff Joseph Rucco is an adult, who at all relevant times, has been a resident and citizen of the State of New York.

22. Defendant Solventum is a Delaware Corporation, with its principal place of business in Eagan, Minnesota.

**JURISDICTION AND VENUE**

23. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class is a citizen of a state different than Defendant.

24. This Court has personal jurisdiction over Defendant because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant resides in this District.

25. Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant resides in this District.

**FACTUAL BACKGROUND**

26. Solventum is a healthcare company that was formed after it spun off from 3M Corporation in 2024.

27. Solvetum is a publicly traded company that reported $8.325 billion in revenue in 2025.

28. Upon information and belief, clients like New York City Health + Hospitals engaged Solventum's professional services, and, in doing so, entrusted Solventum with the Private Information of its patients.

29. Plaintiff and Class Members are individuals who directly or indirectly entrusted Solventum with their sensitive Private Information.

30. Defendant derived a substantial economic benefit from collecting Plaintiff's and Class Members' Private Information. Without the required submission of Private Information, Defendant could not perform the services it provides.

31. Plaintiff and Class Members value the confidentiality of their Private Information and, accordingly, have taken reasonable steps to maintain the confidentiality of their Private Information.

32. Plaintiff and Class Members relied on the sophistication of Defendant to keep their Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

33. By obtaining, collecting, and storing Plaintiff's and Class Members' Private Information, Defendant assumed equitable and legal duties to safeguard Plaintiff's and Class Members' highly sensitive information, including duties to only use this information for business purposes, and to only make authorized disclosures.

34. Despite these duties, Defendant failed to employ reasonable data security measures to protect Plaintiff's and Class Members' Private Information and ultimately

allowed threat actors to breach its computer systems and exfiltrate Plaintiff's and Class Members' Private Information.

35. As a result of the Data Breach, Plaintiff and Class Members have experienced, or are at an increased risk of experiencing, identity theft and fraud.

**THE DATA BREACH WAS A FORESEEABLE RISK OF WHICH DEFENDANT WAS ON NOTICE**

36. It is well known that Private Information, including personal health information in particular, is an invaluable commodity and a frequent target of hackers.

37. Defendant understood that the Private Information it was entrusted with was highly sensitive and of significant value to those who would use it for wrongful purposes.

38. Defendant also knew that a breach of its computer systems, and exposure of the Private Information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose Private Information was compromised.

39. These risks are not theoretical; in light of recent high profile data breaches at other industry-leading companies, including, *e.g.*, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

40. And Solventum knew or should have known that it was particularly at risk of attacks given the prevalence of data breaches targeting the healthcare industry, with several prominent examples in recent years, including Change Healthcare (192.7 million

individuals, February 2024), and Episource (5.4 million people, January 2025), as well as several downstream victims of the MOVEit file-transfer breach, including Maximum, Welltok, and Delta Dental of California, each of which involved several million patients' information.

41. According to the FBI's annual internet crime report, healthcare and public health were the single most-targeted sector for cyberthreats in 2025.[3]

42. Hackers easily can sell stolen data as there has been "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[4]

43. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[5]

44. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2023 alone, there were 6,077 recorded breaches— representing a 34.5% increase compared to 2022.[6] This trend is mirrored in identity theft complaints, which nearly doubled over a four-year span—from 2.9 million

---

[3] American Hospital Association, *FBI: Health care was top target for ransomware, other cyberthreats in 2025*, (April 10, 2026), available at https://www.aha.org/news/headline/2026-04-10-fbi-health-care-was-top-target-ransomware-other-cyberthreats-2025 (last accessed June 16, 2026)

[4] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016) http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

[5] *What To Know About Identity Theft*, FTC Consumer Advice (Sept. 2024), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft.

[6] Flashpoint, *2024 Global Threat Intelligence Report*, (Feb. 29, 2024), https://go.flashpoint.io/ 2024-global-threat-intelligence-report-download.

reports in 2017 to 5.7 million in 2021.[7] Indeed, a 2022 poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[8]

45. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, 2024 had the second-highest number of data compromises in the U.S. in a single year since such instances began being tracked in 2005.[14]

46. The ramifications of Defendant's failure to keep Plaintiff's and Class Members' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

47. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for

---

[7] *Facts & Statistics: Identity Theft and Cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20 Theft%20And%20Fraud%20Reports,%202015-2019%20.

[8] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, Forbes (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statisticsfor-mid-year-2022-that-you-need-to-know/?sh=176bb6887864. [14] *Facts & Statistics: Identity Theft and Cybercrime*, n. 12.

years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[9]

48. Even if stolen Private Information does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

49. The specific types of personal data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and other Class Members especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more. This is because, unlike a compromised credit card, which can be canceled and reissued in days, compromised medical data involves information that is difficult, if not impossible, to reset.

50. As set forth herein, despite this threat, and other known threats, upon information and belief, Defendant failed to take any action to increase security of the Private Information it held and knew to be highly valuable to cybercriminals.

[9] U.S. Gov't Accountability Office, *Report to Congressional Requesters, Personal Information, June 2007*, https://www.gao.gov/new.items/d07737.pdf.

51. Given the value of the Private Information in its possession, Defendant knew or should have known the importance of safeguarding the Private Information entrusted to it and of the foreseeable consequences if its data security systems were breached. Defendant failed, however, to take adequate cyber security measures to prevent the Data Breach from occurring.

**DEFENDANT BREACHED ITS DUTY TO PROTECT PLAINTIFF'S AND CLASS MEMBERS' PRIVATE INFORMATION**

52. Defendant first became aware of the Breach on March 30, 2026, and Defendant claims it launched an investigation immediately, but Defendant has, to date, said nothing about the cause of the breach, or the steps it took, if any, to confirm it has fully resolved the Breach.

53. The Private Information impacted by the Data Breach includes a wide swath of highly sensitive information belonging to Plaintiff and Class Members, including their full names, date of birth, home address, medical record numbers, medical history, and diagnoses.

54. Defendant did not inform New York City Health + Hospitals about the Breach until April 21, 2026, well over a month after it occurred, and Defendant only did so after the information exfiltrated in the Data Breach was posted on the Dark Web.

55. Upon information and belief, Plaintiff and Class Members only received notice informing them that their Private Information was compromised during the Data Breach on or after June 11, 2026.

56. The Data Breach occurred as a direct result of Defendant's failure to implement and follow basic security procedures to protect the Private Information that it had collected and stored.

**DEFENDANT FAILED TO COMPLY WITH FTC GUIDELINES**

57. Defendant is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

58. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[10]

59. Among other guidance, the FTC recommends the following cybersecurity guidelines for businesses in order to protect sensitive information in their systems: [21]

a. Identify all connections to the computers where sensitive information is stored;

b. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

---

[10] *Start with Security – A Guide for Business*, United States Federal Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf. [21] *Protecting Personal Information: A Guide for Business*, United States Federal Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personalinformation.pdf (last visited August 27, 2025).

c. Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

d. Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

e. Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

f. Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g. Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls— settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a

firewall provides is only as effective as its access controls, they should be reviewed periodically;

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

60. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[11]

61. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting

---

[11] *Id.*

from these actions further clarify the measures businesses must take to meet their data security obligations.

62. Defendant failed to properly implement basic data security practices to protect Plaintiff's and Class Members' Private Information. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Private Information constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

63. Defendant was at all times fully aware of its obligations to protect the Private Information of its client's patients given the reams of Private Information that was provided to it by New York City Health + Hospitals. Defendant was also aware of the significant repercussions that would result from a failure to properly secure the Private Information it maintained.

64. Despite its own knowledge of the inherent risks of cyberattacks, and notwithstanding the FTC's data security principles and practices,[12] Defendant failed to disclose that its systems and security practices were inadequate to reasonably safeguard Plaintiff's and Class Members' Private Information.

65. The FTC directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan if a breach occurs.[13] Immediate notification to individuals impacted by a data breach is critical so that those impacted can take measures to protect themselves.

---

[12] *Protecting Personal Information: A Guide for Business, Fed. Trade Comm'n* (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guidebusiness.
[13] *Id.*

66. Here, Defendant inexcusably waited to notify the New York City Health + Hospitals of the Breach until after the information compromised by the Data Breach was made available on the Dark Web.

**THE DATA BREACH'S INCLUSION OF PHI IS PARTICULARLY SIGNIFICANT**

67. With respect to data breaches involving PHI, a study by Johns Hopkins University and Michigan State University that was published in 2019 in the Annals of Internal Medicine found the majority (over 70%) of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft.[14]

68. Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures.

69. The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[15]

70. Health information in particular is likely to be used in detrimental ways—by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[16]

---

[14] *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, DistilINFO (Oct. 2019), https://distilgovhealth.com/2019/10/03/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud/

[15] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HealthTech (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

[16] *Id.*

71. As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[17]

72. The "high value of medical records on the dark web has surpassed that of social security and credit card numbers. These records can sell for up to $1,000 online . . ."[30]

73. Cybercriminals sell health information at a far higher premium than stand-alone PII. This is because health information enables thieves to go beyond traditional identity theft and obtain medical treatments, purchase prescription drugs, submit false bills to insurance companies, or even undergo surgery under a false identity. The shelf life for this information is also much longer—while individuals can update their credit card numbers, they are less likely to change their health insurance information. When medical identity theft occurs, the associated costs to victims can be exorbitant. According to a 2015 study, at least 65% of medical identity theft victims had to "pay an average of $13,500 to resolve the crime."[18]

[17] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, IDX, https://www.idx.us/knowledge-center/you-got-it-they-want-it-criminals-aretargeting-your-private-healthcare-dat (last visited August 7, 2025). [30] Steger, n. 27.

[18] Justin Klawans, *What is medical identity theft and how can you avoid it?*, The Week (Aug. 2, 2023), https://theweek.com/feature/briefing/1025328/medical-identity-theft-how-to-avoid.

74. As noted above, some of the information that was compromised in the Data Breach included, among other things, medical record numbers, medical history, and diagnoses. Accordingly, Plaintiff and Class Members must remain especially vigilant given the highly sensitive nature of the PHI at issue in this Data Breach.

**DEFENDANT FAILED TO COMPLY WITH HIPAA'S MANDATES**

75. Defendant is a business associate under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

76. In addition, Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

77. HIPAA's Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information, while HIPAA's Security Standards for the Protection of Electronic Protected Health Information establishes national security standards for health information that is stored or transmitted electronically.

78. HIPAA requires "comply[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302. Such health information includes

"individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

79. HIPAA's Security Rule requires entities such as Solventum to, *inter alia*, do the following: (i) ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits; (ii) protect against any reasonably anticipated threats or hazards to the security or integrity of such information; (iii) protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and (iv) ensure compliance by its workforce.

80. HIPAA also requires entities such as Solventum to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Solventum is required under HIPAA to "[i]implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

81. Moreover, both HIPAA and HITECH required Solventum to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

82. Finally, HIPAA requires an entity to provide notice of a data breach to affected individuals "without unreasonable delay and in no case later than 60 days following discovery of the breach." 45 C.F.R. §§ 164.400-414.

83. Defendant was, at all times, aware of the mandates of HIPAA. Despite being aware of these mandates and its concomitant obligations, Defendant failed to comply with its obligations and protect the PHI of Plaintiff and Class Members.

84. Defendant's failure in this regard is especially egregious given that Defendant was fully aware of the breadth and depth of PHI it obtained and stored and the foreseeable consequences that would result from unauthorized disclosure of this information.

**PLAINTIFF AND CLASS MEMBERS SUFFERED DAMAGES**

85. The ramifications of Defendant's failure to keep Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

86. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct. Further, the value of Plaintiff's and Class Members' Private Information has been diminished by its exposure in the Data Breach.

87. Plaintiff and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of their Private Information as a result of the Data Breach.

From a recent study, 28% of individuals affected by a data breach become victims of identity fraud—this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[19]

88. Further, Plaintiff and Class Members have incurred and will incur out of pocket costs for protective measures, such as identity theft protection, credit monitoring, credit report fees, credit freeze fees, and similar costs related to the Data Breach.

89. Besides the monetary damage sustained in the event of identity theft, consumers may have to spend hours trying to resolve identity theft issues. For example, the FTC estimates that it takes consumers an average of 200 hours of work over approximately six months to recover from identity theft.[20]

90. Plaintiff and Class Members are also at a continued risk because their information remains unprotected in Solventum's systems, susceptible to further compromise so long as Solventum fails to take necessary and appropriate security and training measures to protect the Private Information in its possession.

---

[19] Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KnowBe4, https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud (last visited August 27, 2025).

[20] Kathryn Parkman, *How to Report identity Theft*, Consumer Affairs (Feb. 17, 2022), https://www.consumeraffairs.com/finance/how-to-report-identity-theft.html.

91. Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their Private Information to strangers.

92. As a result of Defendant's failures detailed herein, Plaintiff and Class Members have suffered and will continue to suffer injuries, including out of pocket expenses; loss of time and productivity through efforts to ameliorate, mitigate, and deal with the future consequences of the Data Breach; theft of their valuable Private Information; the imminent and certainly impeding injury flowing from fraud and identity theft posed by their Private Information being disclosed to unauthorized recipients and cybercriminals; damages to and diminution in value of their Private Information; and continued risk to Plaintiff's and the Class Members' Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as Solventum fails to undertake appropriate and adequate measures to protect the Private Information entrusted to it.

## PLAINTIFF'S EXPERIENCES AND INJURIES

### *Plaintiff Joseph Rucco*

93. Plaintiff Joseph Rucco has been a patient of the New York City Health + Hospital system for decades, and he continues to go through the New York City Health + Hospital system for various medical services.

94. To obtain medical services from New York City Health + Hospitals, Mr. Rucco was required to provide his Private Information to New York City Health + Hospitals, including name, Social Security number, date of birth, address, phone number,

medical information, and health insurance information, which, upon information and belief, Defendant gained access to in the course of rendering services to New York City Health + Hospitals.

95. Mr. Rucco further believed that Defendant would, as one of the companies doing business with the New York City Health + Hospitals system, use reasonable measures to protect his Private Information and would do so in accordance with applicable state and federal law.

96. On or around June 11, 2026, New York City Health + Hospitals sent Mr. Rucco a notice letter informing him that his information was compromised in the Data Breach, including his name, address, date of birth, medical record numbers, medical history, and diagnoses.

97. By waiting until April 21 to notify New York City Health + Hospitals, Defendant deprived Mr. Rucco of the earliest opportunity to guard himself against the Data Breach's effects.

98. As a result of its inadequate cybersecurity, Defendant exposed Mr. Rucco's Private Information to cybercriminals who have already used that information for nefarious purposes.

99. Indeed, since the Data Breach, Mr. Rucco has suffered from increased spam phone calls on the same phone number that he would have provided to New York City Health + Hospitals to receive services. These spam calls include calls purporting to be from credit agencies, or other financial institutions that claim to offer Mr. Rucco loans.

100. Mr. Rucco has also received several suspicious messages purporting to be from his medical providers (or affiliates of the same) indicating that he owes money for certain medical services.

101. Mr. Rucco noticed an increase in spam messages and calls sometime in April 2026.

102. Mr. Rucco has contacted his bank regarding certain unexplained charges to his account, and his bank is continuing to investigate those.

103. Mr. Rucco has also received communications indicating that there have been loan applications made in his name that he did not authorize.

104. As a result of the Data Breach, Mr. Rucco has suffered actual injury in the form of damage to and diminution in the value of his Private Information. This Private Information is a form of intangible property that Defendant was required to protect.

105. Mr. Rucco has also been forced to expend time and effort taking reasonable steps to try and mitigate the impact of the Data Breach, including but not limited to, increased time monitoring his bills and accounts, and time spent investigating charges on his bank account that he did not authorize. This is valuable time that he would have otherwise spent on other activities, including work and/or recreation. This time has been lost forever and cannot be recaptured.

106. As a result of the Data Breach, Mr. Rucco fears for his personal financial security and has experienced anxiety, distress, fear tied to the Data Breach and accompanying invasion of his privacy.

107. Mr. Rucco is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties.

108. Mr. Rucco's injuries were exacerbated by Defendant's failure to inform him of the Data Breach in a timely manner.

109. Mr. Rucco has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

110. Plaintiff brings this class action on behalf of themselves and all other individuals who are similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

111. Plaintiff seeks to represent the following class:

> All individuals in the United States whose Private Information was compromised in the Data Breach (the "Class").

112. Excluded from the Class are Solventum, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families. Also excluded from the Class are New York City Health + Hospitals, its subsidiaries and affiliates, officers and directors, any entity in which New York City Health + Hospitals has

a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, and the members of their immediate families.

113. This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when they move for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

114. **Numerosity:** Plaintiff are informed and believe, and thereon allege, that there are at minimum, tens of thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach.

115. **Commonality:** This action involves questions of law and fact common to the Class. Such common questions include but are not limited to:

a. Whether Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's Private Information;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant was negligent in maintaining, protecting, and securing Private Information;

d. Whether Defendant breached its promises to safeguard Plaintiff and the Class's Private Information;

e. Whether Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. Whether Defendant's Breach Notice was reasonable;

g. Whether the Data Breach caused Plaintiff's and the Class's injuries;

h. What the proper measure of damages is;

i. Whether Plaintiff and the Class are entitled to damages, treble damages, or injunctive relief.

116. **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and Class Members are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and members of the Class all had their Private Information kept by Defendant, and each had their Private Information exposed and/or accessed by an unauthorized third party.

117. **Adequacy of Representation:** Plaintiff are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. In addition, Plaintiff have retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical, as explained above.

118. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed

class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision making.

119. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class member suffered damages by that conduct.

120. **Injunctive Relief:** Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

121. **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

122. Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

123. Plaintiff and Class Members provided their non-public Private Information to Defendant through New York City Health + Hospitals, and that information was entrusted to Defendant in the course of this professional engagement.

124. Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in securing, safeguarding, storing, and protecting the Private Information, which it collected as a condition of providing its professional services, from being compromised, lost, stolen, accessed and misused by unauthorized parties. This duty includes, among other things, designing, maintaining, overseeing, and testing Defendant's security systems to ensure that PII and PHI in Defendant's possession was adequately secured and protected.

125. Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if their Private Information were wrongfully disclosed.

126. Defendant owed a duty of care to Plaintiff and Class Members to provide reasonable security, consistent with industry standards, to ensure that its systems and networks adequately protected their Private Information.

127. Defendant had a special relationship with New York City Health + Hospitals and its other clients, and thus Plaintiff and Class Members. Their willingness to entrust Defendant with Plaintiff's and Class Members' Private Information as a condition of receiving professional services was predicated on the understanding that Defendant would take adequate security precautions to protect that Private Information.

128. By assuming the responsibility to collect and store this data, Defendant had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

129. Plaintiff's and Class Members' Private Information was entrusted to Defendant with the understanding that Defendant would safeguard this information.

130. Defendant's conduct also created a foreseeable risk of harm to Plaintiff and Class Members by failing to: (1) secure its systems and exercise adequate oversight of its data security protocols; (2) ensure compliance with industry standard data security practices, (3) implement adequate system and event monitoring, and (4) implement the systems, policies, and procedures necessary to prevent the Data Breach.

131. Defendant knew or should have known of the risks inherent in collecting and storing PII and PHI, the vulnerabilities of its systems, and the importance of adequate security. Defendant should have been aware of numerous, well-publicized data breaches in the months and years preceding the Data Breach.

132. Defendant breached its common law duty to act with reasonable care in collecting and storing the Private Information of its client's patients, which exists independently from any contractual obligations between the parties. Specifically, Defendant breached its common law, statutory, and other duties to Plaintiff and Class Members in numerous ways, including by:

a. failing to adopt reasonable data security measures, practices, and protocols;

b. failing to implement data security systems, practices, and protocols sufficient to protect Plaintiff's and Class Members' PII and PHI;

c. storing PII and PHI longer than reasonably necessary;

d. failing to comply with industry-standard data security measures; and

e. failing to timely disclose critical information regarding the nature of the Data Breach.

133. Defendant's failure to implement and maintain adequate data security measures to protect Plaintiff's and Class Members' Private Information created conditions conducive to a foreseeable, intentional criminal act in the form of the Data Breach. Plaintiff and Class Members did not contribute to the Data Breach or the subsequent misuse of their Private Information.

134. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

135. Defendant's breach of these duties is evidenced by the Data Breach.

136. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff and Class Members' Private Information by:

a. providing access to this information to third parties, and;

b. failing to properly supervise both the way that Private Information was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

137. Moreover, Defendant breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries in fact.

138. Defendant has admitted that the Private Information of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

139. But for Defendant's wrongful and negligent breaches of duties it owed to Plaintiff and Class Members, the Private Information of Plaintiff and Class Members would not have been compromised.

140. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

141. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

142. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their Private information by criminals, the invasion of their privacy, the improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private

Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

143. Plaintiff and Class Members also experienced fear, anxiety, and emotional distress as a result of their sensitive medical information being exposed.

## COUNT II
## NEGLIGENCE *PER SE*
## (On Behalf of Plaintiff and the Class)

144. Plaintiff restate and reallege all preceding allegations above as if fully set forth herein.

145. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

146. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the Private Information entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff's and the Class Members' sensitive Private Information.

147. Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq.*, Defendant had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

148. Defendant breached its duties to Plaintiff and Class Members under the

FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

149. Defendant violated Section 5 of the FTC Act, HIPAA, and similar state statutes by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information and by failing to comply with industry standards.

150. The harm that has occurred is the type of harm the FTC Act and HIPAA is intended to guard against.

151. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

152. But for Defendant's wrongful and negligent breach of its duties owed, Plaintiff and Class Members would not have been injured.

153. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiff and member of the Class to suffer the foreseeable harms associated with the exposure of their Private Information.

154. Defendant's various violations and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

155. As a direct and proximate result of Defendant's negligence per se, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**COUNT III**
**BREACH OF THIRD PARTY BENEFICARY CONTRACT**
**(On Behalf of Plaintiff and the Class)**

156. Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

157. Defendant entered into one or more contracts with its clients, written or implied, to provide certain services.

158. Pursuant to that contract, Defendant received, among other things, Plaintiff's and Class Members' Private Information from New York City Health + Hospitals and their other clients in exchange for Defendant's services.

159. Upon information and belief, the contracts between these entities and Defendant contained material terms requiring Defendant to use reasonable data security sufficient to safeguard Plaintiff's and Class Members' Private Information.

160. Defendant knew that Plaintiff and the Class Members were the intended beneficiaries of the contracts Defendant had with its clients, including its contract(s) with New York City Health + Hospitals.

161. Defendant also knew that if it breached its contractual obligation to safeguard the Private Information with which it had been entrusted, Plaintiff and Class Members would be harmed.

162. Defendant breached these contracts – as evidenced by the Data Breach – by failing to use reasonable data security measures sufficient to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure.

163. As a direct and proximate result of Defendant's breaches of these contracts, Plaintiff and Class Members have all suffered and will continue to suffer injuries as set forth herein and are entitled to damages sufficient to compensate for the losses they sustained as a direct result thereof.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

164. Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

165. Plaintiff and Class Members conferred a benefit on Defendant by permitting Defendant's clients to entrust Defendant with their Private Information.

166. The monies Defendant was paid by its clients in the ordinary course of business included a premium for Defendant's cybersecurity obligations and were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiff's and Class Members' Private Information.

167. Defendant knew that Plaintiff and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from Plaintiff's retained data and used Plaintiff's and Class Members' Private Information for business purposes.

168. Defendant failed to disclose facts pertaining to its substandard information systems, or defects and vulnerabilities therein, before their clients provided Defendant with Plaintiff's and Class Members' Private Information.

169. Defendant enriched itself by hoarding the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information.

170. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing ineffective security measures and diverting those funds to its own personal use. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

171. Defendant failed to provide reasonable security, safeguards, and protections to the Private Information of Plaintiff and Class Members, and as a result, Defendant was overpaid.

172. Under principles of equity and good conscience, Defendant should not be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

173. Plaintiff and Class Members have no adequate remedy at law.

174. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach;

(iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

175. Plaintiff and Class Members are entitled to restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiff and Class Members may seek restitution or compensation.

## COUNT V
## VIOLATIONS OF THE MINNESOTA CONSUMER FRAUD ACT
## Minn. Stat. § 325F.68 *et seq.* ("MCFA")
## (On Behalf of Plaintiff and the Class)

176. Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

177. Plaintiff and Class Members are all "persons" pursuant to Minn. Stat. § 325F.68, subd. 3.

178. The healthcare services that Defendant provided to Plaintiff and Class Members are "merchandise" pursuant to Minn. Stat. § 325F.68, subd. 2.

179. Under the Minnesota Consumer Fraud Act ("MCFA"), "[t]he act, use, or employment by any person of any fraud, unfair or unconscionable practice, false pretense,

false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damages thereby, is enjoined as provided in section 325F.70." Minn. Stat. § 325F.69(a).

180. Defendant's failure to adequately protect Plaintiff and Class Member's PII/PHI is an unfair or unconscionable practice under the MCFA. Defendant knew, or should have known, that a data breach could occur and that Plaintiff and Class Members' PII/PHI is valuable to cybercriminals. Instead of adequately protecting that PII/PHI, Defendant allowed cybercriminals to access Plaintiff's and Class Members' PII/PHI and did not timely notify Plaintiff and Class Members of the Data Breach.

181. Additionally, Defendant misled Plaintiff and Class Members regarding its data security, by representing in its Privacy Policy that it "maintains technical, physical and organizational measures designed to protect the confidentiality, security, and integrity" of the personal data it maintains, and that, when collecting, maintaining, accessing, or using PHI, Defendant does so "using systems and processes consistent with information privacy and security requirements under applicable federal and state laws, including, without limitation, HIPAA."[21]

182. As a result of Defendant's above-described violations of the MCFA, Plaintiff and Class Members have suffered and will continue to suffer injury including, but not limited to: (i) a substantial increase in the likelihood of identify theft; (ii) the compromise,

[21] https://www.solventum.com/en-us/home/legal/website-privacy-statement/#protecting-data

publication, and theft of their PII/PHI; (iii)out-of-pocket expenses associated with the prevention, detection and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI, which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

183. Where, as here, Plaintiff and the Class Members bring claims that inure to the public benefit, Minnesota's private attorney general statute allows individuals who have been injured through a violation of the MCFA to bring a civil action and recover damages, together with costs and disbursements, including reasonable attorney's fees.

184. Pursuant to Minn. Stat. § 325F.70, subd. 3, Plaintiff and Class Members seek damages, attorney's fees, and all other equitable relief as determined by the Court.

**COUNT VI**
**VIOLATIONS OF THE MINNESOTA UNIFORM DECEPTIVE PRACTICES ACT**
**Minn. Stat. §§ 325D.43-48, *et seq.* ("MUDTPA")**
**(On Behalf of Plaintiff and the Class)**

185. Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

186. The Minnesota Uniform Deceptive Trade Practices Act, ("MUDTPA"), Minn. Stat. § 325D.43-48, *et seq.*, prohibits deceptive trade practices in person's business, vocation, or occupation.

187. Defendant advertised, offered, or sold goods in Minnesota—specifically medical services—and therefore engaged in business directly or indirectly affecting the people of Minnesota.

188. By conduct complained of in the preceding paragraphs, Defendant violated MUDTPA's provisions, including section 325D.44(7) which applies to representing goods or services are of a particular standard, quality, or grade, and section 325D.44(14) which covers engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding.

189. Defendant engaged in deceptive and unfair acts and practices, misrepresentation and the concealment and/or omission of material facts, in connection with the sale and advertisement of their services, in violation of the MDUTPA, by, among other things, representing in its Privacy Policy that it "maintains technical, physical and organizational measures designed to protect the confidentiality, security, and integrity" of the personal data it maintains, and that, when collecting, maintaining, accessing, or using PHI, Defendant does so "using systems and processes consistent with information privacy and security requirements under applicable federal and state laws, including, without limitation, HIPAA."[22]

[22] https://www.solventum.com/en-us/home/legal/website-privacy-statement/#protecting-data

190. These statements are deceptive and unfair acts or practices because Defendant knew or should have known that its cybersecurity processes were inadequate and were not in line with the requirements identified in Defendant's Privacy Policy.

191. Defendant intended for its clients to rely on these and similar representations in connection with Defendant's offering of goods and services.

192. Had Defendant disclosed to its clients that it had inadequate cybersecurity measures, those clients would have obtained services from another provider. Likewise, had Defendant disclosed to Plaintiff and Class Members that its cybersecurity measures were inadequate, Plaintiff and Class Members would have sought medical services from another provider, or would have sought to ensure that New York City Health + Hospitals obtained the services it received from Defendant from another provider.

193. Defendant's wrongful practices were and are injurious to the public because those practices were part of Defendant's generalized course of conduct that applied to the Class.

194. As a result of Defendant's above-described violations of the MUDTPA, Plaintiff and Class Members have suffered and will continue to suffer injury including, but not limited to: (i) a substantial increase in the likelihood of identify theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii)out-of-pocket expenses associated with the prevention, detection and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI, which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be

required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

195. Pursuant to MUDTPA, Plaintiffs and the Class are entitled to injunctive relief and other appropriate relief, as allowed by law.

**COUNT VII**
**VIOLATIONS OF THE MINNESOTA HEALTH RECORDS ACT**
**Minn. Stat. §§ 144.291, *et seq.* ("MHRA")**
**(On Behalf of Plaintiff and the Class)**

196. Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

197. Under the Minnesota Health Records Act ("MHRA"), "Health Record" means any information, whether oral or recorded in any form or medium, that relates to the past, present, or future physical or mental health or condition of a patient; the provision of healthcare to a patient; or the past, present, or future payment of provisions of healthcare to a patient. Minn. Stat. § 144.291, subd. 2(c).

198. The PII/PHI of Plaintiff and Class Members that was compromised in the Data Breach falls within the definition of "Health Record" as that term is defined by the MHRA.

199. Plaintiff and Class Members are "Patients" as that term is defined under the MHRA. *See* Minn. Stat. § 144.291, subd. 2(g).

200. Under the MHRA, it is unlawful for a person who receives health records from a provider to release a patient's health records without the patient or patient's legally

authorized representative's consent, specific authorization, or a representative from a provider that holds a signed and dated consent from the patient authorizing the release.

201. By allowing Plaintiff's and Class Members' PII/PHI to sit exposed by inadequate data security, Defendant released Plaintiff's and Class Members' health records to cybercriminals via the Data Breach.

202. Neither Plaintiff nor Class Members consented to having their health records released to cybercriminals.

203. Defendant's release of Plaintiff's and the Class Members' PII/PHI in the Data Breach constitutes an "affirmative" release under Minnesota law.

204. Defendant's release of Plaintiff's and the Class Member's PII/PHI caused them to suffer actual injury, including injury including, but not limited to: (i) a substantial increase in the likelihood of identify theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii)out-of-pocket expenses associated with the prevention, detection and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI, which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

205. Under the MHRA, a provider or other person who causes an unauthorized release of a health record by negligently or intentionally releasing the health record is liable to the patient for compensatory damages, plus costs and reasonable attorney's fees.

206. Pursuant to the MHRA, Plaintiff and the Class seek compensatory damages, plus costs and reasonable attorney's fees, and all other relief allowed by law, including injunctive and declaratory relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray for judgment as follows:

A. For an Order certifying this action as a class action, appointing Plaintiff as class representatives for the Class, and appointing Plaintiff's counsel to represent the Class;

B. For equitable relief enjoining Solventum from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII and PHI, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C. For equitable relief compelling Solventum to utilize appropriate methods and policies with respect to data collection, storage, and safety, and to disclose with specificity the types of PII and PHI compromised as a result of the Data Breach;

D. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Solventum's wrongful conduct;

E. Ordering Solventum to pay for not less than ten years of credit monitoring services for Plaintiff and Class Members;

F. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G. For an award of punitive damages, as allowable by law;

H. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

I. Pre- and post-judgment interest on any amounts awarded; and

J. Such other and further relief as this court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

**Dated: June 17, 2026**

Respectfully submitted,

By: *<u>/s/ Kate M. Baxter-Kauf</u>*

Karen H. Riebel (MN #0219770)
Kate M. Baxter-Kauf (MN #392037)
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue S, Suite 2200
Minneapolis MN 55401
Telephone: (612) 596-4097

Jean S. Martin (pro hac vice forthcoming)
Christopher J. Pollack (pro hac vice forthcoming)
**AYLSTOCK WITKIN KREIS & OVERHOLTZ PLC**
18 E. Main Street, Suite 200
Pensacola, Florida 32502
(850) 202-1010
jmartin@awkolaw.com
cpollack@awkolaw.com
*Counsel for Plaintiff and the Proposed Class*